**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK DIVISION**

| | |
|---|---|
| BULLPUP SCIENTIFIC LTD., **)** | |
| **)** | |
| *Plaintiff*, **)** | Civil Action No. _____ |
| **)** | |
| v. **)** | **JURY TRIAL DEMANDED** |
| **)** | |
| BECTON, DICKINSON AND COMPANY. **)** | |
| **)** | |
| *Defendant*. **)** | |
| **)** | |

## <u>PLAINTIFF'S ORIGINAL COMPLAINT</u>

Plaintiff, Bullpup Scientific Ltd. ("Plaintiff" or "Bullpup") files this Original Complaint for Patent Infringement against Defendant Becton, Dickinson and Company alleging as follows:

## I.    <u>THE PARTIES</u>

1.      Bullpup is an Israeli limited liability company with a principal place of business at 10 David Elazar St., Suite 805, Haifa 3508107, Israel.

2.      Defendant Becton, Dickinson and Company ("Defendant" or "BD") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at 1 Becton Drive, Franklin Lakes, New Jersey, 07417-1880.

3.      Defendant has designated CT Corporation System as its New Jersey Registered Agent and may be served at 820 Bear Tavern Road, West Trenton NJ 08628.

## II.    JURISDICTION AND VENUE

4.      This is an action for patent infringement of a United States patent under 35 U.S.C. §§271, *et seq*.  This Court has subject matter jurisdiction over this lawsuit under, *inter alia*, 28 U.S.C. §§1331, 1332, and/or 1338.

5.      As discussed further herein, Defendant manufactures and sells catheters and catheter insertion devices, including a midline catheter insertion device called the PowerGlide Pro Midline Catheter ("the Accused Product"), which infringes one or more claims of Plaintiff's U.S. Patent No. U.S. 10,413,706 ("the Asserted Patent").[1]

6.      Defendant engages in business in the State of New Jersey and has its principal place of business in Franklin Lakes, New Jersey.  Defendant regularly supplies the Accused Product to hospitals in New Jersey either directly or indirectly through distributors in New Jersey.  Defendant, directly and/or through intermediaries, has committed acts of infringement within New Jersey, including in this District, giving rise to this action, such that Defendant reasonably should know and expect that it could be hailed into this Court as a consequence of such activity.  Defendant has committed at least a portion of its infringing activity in New Jersey, and specifically, within this judicial district.  Accordingly, there is personal jurisdiction over Defendant in New Jersey, and venue is proper in this judicial district pursuant to 28 U.S.C. §1391 and/or 28 U.S.C. §1400(b).

## III.    BACKGROUND OF RELEVANT TECHNOLOGY, THE ASSERTED PATENT AND THE PLAINTIFF

### A.    General Description Of The Technology At Issue

7.      The technology in this case involves developments to intravenous ("IV") catheters.

---

[1] A true and correct copy of the Asserted Patent is attached hereto as Exhibit A and made a part hereof this Complaint herein.

8.      By way of background, when patients need medications, fluids, or nutrients, healthcare providers often use a small tube called a catheter to deliver them directly into their bloodstream.  To place a catheter, a medical practitioner (typically, a nurse) inserts a thin needle into a vein (usually in the arm or hand) and then slides the catheter into place so the needle can be removed.  This placement of a catheter allows treatments to be provided directly to the bloodstream using the same delivery means, rather than requiring a new needle to be inserted each time for every administration.

9.      One example of such a catheter is an "over the needle" catheter.  An over-the-needle catheter includes a needle located inside a hollow cannula of the catheter.  In use, the practitioner introduces the combined needle/catheter into the patient until the needle penetrates the vein. Thereafter, the catheter's cannula slides over the needle and into the vein.  The needle may then be removed, leaving the cannula in place for delivery of substances to the vein.

10.      Some catheters are designed for short-term use – requiring their frequent replacement if kept in the patient for more than 72 hours – while others can stay in the body longer with less risk of complications.  For example, peripheral catheters can generically be classified into two categories: (1) short peripheral catheters; and (2) long/midline peripheral catheters.[2,3]

11.      A short peripheral catheter is a catheter used to access superficial veins, and is typically less than three inches (7.62 cm) long.[4] In contrast, midline catheters are longer than short peripheral catheters, such that midline catheters can be placed into deeper upper arm veins, and can stay in the veins for longer periods of time than short peripheral catheters. Short peripheral

---

[2] https://pmc.ncbi.nlm.nih.gov/articles/PMC12041681/pdf/10.1177_20503121251337197.pdf, at pg. 2.
[3] Within this Complaint, both long peripheral catheters and midline catheters are referred to as midline catheters.
[4] More particularly, under some definitions, a short peripheral catheter is 1.18 inches to 2.36 inches (3 to 6 cm) long. https://pmc.ncbi.nlm.nih.gov/articles/PMC12041681/pdf/10.1177_20503121251337197.pdf, at pg. 2. However, the exact length ranges can slightly vary from medical professional to medical professional.

intravenous catheters are simple to insert but cannot safely stay in the patient for more than two to three days. Because of the length, short peripheral catheters are more rigid, which can damage the vein lining and can lead to inflammation and other issues.  Thus, short peripheral catheters need to be replaced frequently when the patient requires treatment for a more extended period of time. Replacing short peripheral intravenous catheters has numerous downsides, including: (1) requiring multiple needle insertions, thus, requiring puncturing the patient's skin multiple times, which can be uncomfortable for the patient, and is a frequent complaint of patients; and (2) requires finding a new location to access a vein, which can be extremely difficult for older patients who typically have veins that are difficult to locate and access.

12.    In order for a catheter to stay in a vein for an extended amount of time, there is a need to use catheter tubes that are longer than short peripheral catheters and that are made of softer and more flexible material than short peripheral catheters, which complicate the insertion technique. Midline catheters are not just longer than short peripheral catheters but also made of softer and more flexible material.  However, due to the increased length, softness, and flexibility of midline catheters, prior to the invention of the Asserted Patent, insertion of a midline catheter into a target vein was significantly more difficult than insertion of a short peripheral intravenous catheter into a target vein.  Insertion of such midline catheters required significantly more training and/or significantly more complex insertion devices, reducing the number of practitioners capable of safely inserting such midline catheters, rendering them less accessible and relatively unpopular.

13.    This litigation involves developments in the midline catheter market and the problems that Bullpup's invention, described and claimed in the Asserted Patent, solved in the industry. The Accused Device, the PowerGlide Pro Midline Catheter, and Bullpup's M/29 Midline Catheter discussed further below, are both marketed as a midline catheter, and are designed and

marketed to address the same market and the same patients. More specifically, the Accused Product, is designed and marketed as having a longer and softer catheter to help minimize vessel wall trauma, allowing for the catheter to be able to stay in the patient for up to 29 days, and reducing the need for multiple short peripheral catheter insertions. As an example, applications for the Accused Device and Bullpup's M/29 Midline catheter include intravenous antibiotic delivery, which can require around 5 to 14 days of IV access.

### B.  The Inventors' First Attempts To Design A New Midline Catheter

14.     The inventors of the Asserted Patent, Shai Amisar and Ronen Radomski, each have extensive experience with designing intravenous ("IV") catheters, starting with their substantial initial knowledge gleaned from working in the medical devices branch of the Israeli Medical Corps. During their time in the Israeli Medical Corps, Amisar and Radomski had extensive experience with medical procedures, including inserting catheters.

15.     After exiting the Medical Corps, in 2004, prior to forming Bullpup, Amisar and Radomski established FlexiCath Ltd., a privately held company headquartered in Pittsburgh, Pennsylvania, and Tel Avivi, Israel, which developed and marketed sterile catheter insertion systems for midline catheters. One of FlexiCath's goals was to address the need for an easy way to insert a midline catheter.

16.     While they were at FlexiCath, Amisar and Radomski realized that about 90% of patients admitted to a hospital will be given a catheter for IV access, and about 30% of those patients would need more than three days of IV access. Yet at the time, the market did not have a catheter solution for this particular patient scenario.

17.     For example, it is extremely common for patients to require intravenous antibiotic treatments while being treated in a hospital. Such treatments typically require around a week of

IV access.  At the time, for such applications, the medical industry typically used multiple short peripheral catheters, each of which needed to be changed every three days on average. This frequent changing of short peripheral catheters required multiple needle sticks into the patient. Sensing a gap in the market, Amisar and Radomski began exploring the idea of a simplified and cheaper midterm catheter that could be used more generally.

18.    Amisar and Radomski first attempt at solving this problem was a solution called the "Firm Grip." Pictured below, this midline catheter had improved insertion control and less risk of infection compared to other midline catheters:



19.    The FirmGrip completely enclosed the catheter in a sterile silicon sleeve, which had a handgrip that allowed the user to control the movement of the catheter via the sleeve, and the sleeve was removed after catheter insertion was completed, thereby reducing the risk of infection.  In comparison, some of the other midline catheters at the time also included a sheath but required the operator to manipulate the catheter through a small hole in the sheath, which was more complex and required the operator to have more training than was required to use the FirmGrip.  However, due to the need to control the FirmGrip's catheter insertion via the sheath, the FirmGrip still had control and application difficulties in the industry.

20.    The development of the FirmGrip product and Amisar and Radomski's insight into developing a new market caught the eye of industry catheter manufactures, including Defendant.

More specifically, over a six-year period, FlexiCath had multiple meetings with not only Defendant to discuss the FirmGrip but also C.R. Bard, Inc., which was later acquired by Defendant. More specifically, during the mid-2007 through October 2011 timeframe, FlexiCath had multiple meetings with C.R. Bard in which FlexiCath representatives discussed their newly minted technology for a midline over the needle catheter insertion device, including the FirmGrip.

21.     As but one example of these discussions, on July 31, 2010, FlexiCath and Bard Access Systems, Inc. signed a nondisclosure agreement in order to further discuss the FirmGrip, and the possibility of entering certain business arrangements.  In the meetings with C.R. Bard, and under the protection of this nondisclosure agreement, Amisar and Radomski explained the market need for use of midline catheters for patients requiring IV access for around 3-29 day periods.

22.     In response, C.R. Bard requested samples of the FirmGrip, which FlexiCath supplied to C.R. Bard.  C.R. Bard's representative expressed that C.R. Bard liked the idea of addressing that market need, and that C.R. Bard wanted to enter the market, but were going to use a different design for their midline catheter insertion device, which was later called the Powerglide Midline Catheter ("Bard Powerglide").[5]  C.R. Bard did not share any confidential information with FlexiCath regarding its products or development during these meetings.

**C.     Amisar and Radomski Continue Improving Over the Available Options In The Market While At FlexiCath And Move Beyond The FirmGrip Into A More Advanced Midline Catheter**

23.     In late 2012, Amisar and Radomski sought to further simplify the way midline catheters were inserted compared to the multiple short catheters that were being used at the time. Some of the issues with midline catheter insertion systems as of 2012 were that inserting the

---

[5] C.R. Bard's "Powerglide," which received 510(k) clearance from the UFDA to sell that device in the U.S. on June 1, 2012. This "Powerglide" is not accused of infringement and is discussed solely for background purposes.

cannula of a catheter into an intravenous system was difficult and prone to complications. For example, skilled medical personnel needed to puncture the skin properly at a correct location and insert the cannula in a correct blood vessel. Between puncturing the vein with the needle and inserting the catheter into the vein over the needle, the medical personnel were required to hold the catheter insertion system in place but because of the catheter grip location, the medical personnel would often accidently pull out the needle from the vein before they were able to insert the catheter into the vein, which in turn would require another puncturing attempt. This caused unnecessary pain and discomfort for the patient and unnecessary additional stress for the medical personnel, along with unnecessary efforts of additional attempts to reinsert the displaced catheter.

24. To address these problems, Amisar and Radomski realized that, in order to provide stability to midline catheters, the grip of the catheter needed to be reconfigured. More specifically, when observing the demonstration at the role out of the initial PowerGlide product in October 2012 trade show, Amisar noticed that all Bard personnel that demonstrated the PowerGlide product struggled with moving their hands and operating the system having to cross their hands and release the holding on the catheter to re-position. This gave Amisar the idea that the way the device was operated, and specifically how the operator held the device and where, was of critical importance. Therefore, in March 2013, while still at FlexiCath, Amisar and Radomski put the concept design idea on paper and started making the below illustrations of a new improved midline catheter insertion device which had a catheter grip element at the end of a forward arm extending from a connection to the proximal end of the catheter:



Catheter grip element

Catheter inside vein



25. By April 2013, Amisar and Radomski created a prototype and mockup of this new improved midline catheter insertion device, which included a catheter flag (grip) which was located at the end of a forward arm extending from a connection to the proximal end of the catheter:

Needle "Tweezers"

Needle

Catheter "Flag"

Catheter



Assembly – ready to use



26.     The mockup depicted the catheter grip close to the tip of the needle in addition to the forward arm being connected to the proximal end of the catheter via a downward grip with two curved arms:

# Grip close to Needle/Catheter
# (presented in mockup)



27.    In April 2013, Amisar and Radomski also created a mockup drawing, which eventually became Figure 6H of the Asserted Patent.  The mockup drawing depicted the forward grip (element 12 in Figure 6H of the Asserted Patent), forward arm (element 10 in Figure 6G of the Asserted Patent), the middle section (element 13 in Figures 6G and 6H of the Asserted Patent), the catheter closing unit (element 60 in Figure 6D of the Asserted Patent), the side arms (elements 25a and 25b in Figure 6D of the Asserted Patent), the slanted portions (elements 26a and 26b in Figures 6G and 6H of the Asserted Patent ), the forward finger grips (elements 27a and 27b in Figures 6G and 6H of the Asserted Patent), the proximal stabilizing grip (element 61 in Figure 6D of the Asserted Patent), and the proximal hollow end portion (element 8' in Figures 6G and 6H of the Asserted Patent):

28.    These developments ultimately led to the filing of the provisional application U.S. Patent App. No. 62/033,134, (the "'134 Application") on August 5, 2014, which disclosed the invention at issue. The '134 Application is the application from which the Asserted Patent claims priority.

29.    As ultimately described in this application, and later in the issued Asserted Patent, a key difference between the inventive catheter device and the prior art was that its grip placement was moved forward (closer to the insertion point on the patient), as opposed to prior art catheters, in which the catheter grip was located behind the end of the catheter (close to the operator). When the catheter grip is located proximally to the user compared to the grip's connection to the catheter, the catheter grip is further away from the distal end of the catheter that is inserted into the patient and the insertion site itself. This in turn makes it harder for the operator to steer the distal end of the catheter into the insertion site.  In contrast, a catheter grip located closer to the end that is inserted into the patient allows for a much more controlled and easy manipulation of the catheter

insertion device.  This new forward grip also allows for the stabilization of the catheter insertion without the need for a guidewire to keep the tip in the vein.  These advantages support the need for midline catheters. The new forward grip can be used in conjunction with various catheters with guidewires or without, and will still improve ease of insertion, resulting in lower costs, and allow more users to be able to operate such midline catheters. The prior art problems, such as loss of stability, discomfort, and chances of accidental pullout due to a proximal catheter grip, discussed above, were ultimately addressed and solved by the Asserted Patent.

### D. Amisar and Radomski Form A New Company in 2015 – Bullpup Scientific Ltd. - And The Asserted Patent Issues In 2019 And Is Assigned to Bullpup

30.    In the second half of 2014, after the filing of the filing of the '134 Application, Amisar and Radomski left FleixCath. Shortly thereafter, FlexiCath's Intellectual Property, including the '134 Application, was sold to Elad Investments (1980) Jerusalem Ltd ("Elad"). Around the same time, Amisar and Radomski formed Bullpup, with Amisar its Chief Executive Officer and Radomski its Chief Operating Officer, and Elad assigned FlexiCath's intellectual property, including the '134 Application, to Bullpup.

31.    The company was named "Bullpup" as a reference to the bullpup rifle design concept, which related to moving the firing grip in front of the breech of the rifle, instead of behind it. The bullpup rifle design shifted the control forward to improve handling of a long structure without reducing its effective length.  The reason Amisar and Radomski named their catheter insertion system after the bullpup concept is because, like a bullpup rifle, they found that it would be beneficial to move the catheter grip to be in front of where the catheter grip attaches to the catheter to improve handling of catheters.

32.    After filing the provisional application, Amisar and Radomski assigned their rights in the invention to Bullpup.

33.     On September 17, 2019, the United States Patent and Trademark Office ("USPTO") issued United States Patent No. 10,413,706 (the "Asserted Patent"[6]) entitled "Method and apparatus for inserting a catheter tube." *See* Exh. A. The assignee of the Asserted Patent is Bullpup Scientific Ltd., which has all right, title and interest in and to the Asserted Patent and Bullpup maintains all rights to enforce the patent against infringers and to collect damages for all relevant times, including the right to prosecute this action.

34.     The invention of the Asserted Patent discloses a catheter insertion system that has a forward arm that allows for a safe aseptic insertion of an intravascular catheter tube into a peripheral blood vessel, which can prevent accidental withdrawal of the catheter, and which can provide a forward griping point for catheters over 5 cm (e.g., for midline catheters).

35.     As an example of the claimed invention, Claim 1 of the Asserted Patent provides as follows:

A catheter insertion system comprising:

an IV catheter comprising a distal cannula attached to a proximal hollow hub;

a forward arm attachably connected to a proximal portion of said IV catheter or element connected thereto, and extending distally therefrom;

a needle configured to pass through and protrude from the cannula;

wherein the forward arm comprises a distal forward grip;

wherein the forward arm comprises a middle section connecting between the distal forward grip and a downward grip connected to the proximal end of said middle section,

wherein said downward grip comprises two grasping arms extending downwards and substantially curved.

36.     Further, Claim 13 of the Asserted Patent provides as follows:

A method for inserting an IV catheter into a blood vessel of a patient comprising the steps of:

---

[6] The Asserted Patent is entitled to a priority date of at least August 5, 2014, based on the initial '134 Provisional Application and the fact that multiple claims, including at least claims 1 and 13 of the Asserted Patent are supported by the disclosures existing in the originally filed '134 Provisional Application.

providing a catheter insertion system comprising:

a. an IV catheter comprising a distal cannula attached to a proximal hollow hub, and comprising a proximal hollow end portion;

b. a forward arm attachably connected to a proximal portion of said IV catheter or element connected thereto, and extending distally therefrom;

c. a needle passing through said IV catheter;

d. a catheter closing unit comprising a proximal stabilizing grip which comprises a hollow surface corresponding in shape and adapted to be close fitting around said proximal end portion;

wherein said catheter closing unit further comprises two side arms attached to said proximal stabilizing grip,

A) puncturing the patient's blood vessel;

B) pulling/pushing said forward arm distally thus inserting the cannula into the blood vessel;

C) inserting the cannula in place by continuing to pull/push the forward arm distally;

D) proximally pulling a puncturing needle until it exits the IV catheter;

E) disconnecting the forward arm from said IV catheter or element connected thereto;

F) fixing the IV catheter to the patient's skin;

proximally pulling the catheter closing unit and removing it from the IV catheter after step D.

**E.    After Filing the PCT Applications, Bullpup Engages In Discussions Regarding The Invention With Defendant and Defendant's Predecessor Entities**

37.    While the '134 Application was filed in 2014 and the Asserted Patent was issued in 2019, Defendant and Bullpup had regular conversation about the ultimately claimed invention and the Asserted Patent during this critical five-year period.

38.    On October 25, 2015, after the filing of its international patent applications on its new idea for a catheter insertion system, Bullpup reached out to Defendant's Director of Strategic Technology Partnerships for BD Technologies regarding a previous request to FlexiCath to provide updates on any new catheter projects. In the October 25, 2015 email, Bullpup explained that it developed a new patent pending catheter design with numerous benefits over the then-market

16

systems including: (1) allowing the introduction of a 8-10 cm catheter in a very similar manner to a standard IV cannula; (2) required no additional training for medical personnel compared to market devices, and (3) was not a complicated procedure due to its design, which included a forward grip, which made it simple to insert like a short peripheral catheter.  In that email, Bullpup attached marketing literature describing the M/29 Bullpup Midline IV Catheter System, and specifically showing claimed features of the Asserted Patent, such as the forward arm having a distal forward grip and downward grip. The following diagram was included in this material, which was Fig. 5A of the '134 Application, and eventually became Fig. 5A in the Asserted Patent:



39.    During these discussions, Bullpup informed Defendant that it had an international patent application that would soon publish.  Representatives of Defendant asked when it would be published, which Bullpup explained that it anticipated that it would be within the next few months. Bullpup also provided samples and prototypes of its M/29 Bullpup Midline Catheter to Defendant.

40.    Subsequently, on November 12, 2015, C.R. Bard, Inc., which had been acquired by Defendant, filed a FDA 510(k) premarket application for its new product, the PowerGlide Pro Midline Catheter.  Bullpup's application was published shortly thereafter on February 11, 2016.

## IV.    THE ACCUSED PRODUCT AND ITS DEVELOPMENT HISTORY

41.    Defendant and/or Defendant's predecessor, C.R. Bard, first came out publicly with the "Powerglide" catheter in October 2012. The Bard Powerglide was the initial "Powerglide"

product, as opposed to the "Powerglide Pro," which is the Accused Product in this case.  The Accused Product replaced the Bard Powerglide, and was a vast improvement over the Bard Powerglide which is not sold anymore.

42.     More specifically, C.R. Bard's original "Powerglide" had the catheter handle located proximally (to the operator) relative to the catheter, which instructed the user to move the hand from the hold when inserted back to the end of the assembly in order to give room for the other hand to hold the insertion lever to push it forward. This step was before any stabilization was done, thus risking the success of insertion and made steering the catheter in the insertion site overly complicated.  The design of the Bard Powerglide, and other similar prior art midline catheters insertion devices, was particularly overly complicated because the length of the device meant that when holding the device at the end closest to the operator, it was difficult to control the end furthest from the operator (close to the insertion point on the patient), and, thus required more skill to operate successfully.  More specifically, the Bard Powerglide and other similar prior art midline catheters required controlling both the needle and the catheter from two different points during operation as one hand needed to move backwards in order for the second hand to grab the handle that was at the back of the insertion point and was obscured by the insertion hand, which caused loss of stability, discomfort, and chances of accidental pullout:[7]

 

---

[7]https://static.bd.com/assets/product/Documents/Peripheral%20Intervention%20(PI)/0736292_PowerGlide_IFU_web.pdf

For example, such a design where both hands griped the device from the proximal end of the device made it difficult to steer the end furthest from the operator, similar to trying to play pool by holding the pool cue with both hands at the end closest to the player.  Additionally, in the Bard Powerglide and other similar prior art midline catheters, the operating grip of the guide wire is further back requiring re-positioning of the hands to operate the insertion device, which further reduced stability of the insertion process.

43.    These issues led Defendant to develop the "PowerGlide Pro" catheter product. On or about June 2, 2016, after learning of Bullpup's new design, Defendant received FDA approval to manufacture and sell its PowerGlide Pro Midline Catheters.  Upon information and belief, in late 2016 or in 2017, Defendant began producing and selling at least the PowerGlide Pro Midline Catheter (the "PowerGlide Pro" or "Accused Product"), depicted below:[8]



44.    The Accused Product is marketed as a midline catheter insertion system for inserting a catheter that can provide vascular access in the patient for less than 30 days to sample blood and administer fluids intravenously.  The Accused Product includes a needle, catheter, guidewire push-off button, wings, grips, and housing:

---

[8] https://www.bd.com/en-us/products-and-solutions/products/product-families/powerglide-midline-catheters#powerglidepro



45.    As described in Bard's 2015 FDA submission, like the Bard Powerglide, the Powerglide Pro included a catheter handle that attached to the catheter hub located at the proximal end of the catheter.   However, unlike the Bard Powerglide, the Powerglide Pro catheter wings (catheter handle) are attached to a forward arm that extended distally (away from the operator) from the connection to catheter hub at the proximal end (end closest to the operator) of the catheter:



46.    While the Accused Product includes a "guidewire designed to assist with insertion success"[9] Defendant's literature explains that it is "designed to aid with difficult sticks and allows for steep angles of insertion."[10] In other words, the guidewire is not required for general IV access.

---

[9] https://www.bd.com/en-ca/products-and-solutions/products/product-families/powerglide-pro-midline-catheter
[10] https://www.bd.com/en-ca/products-and-solutions/products/product-families/powerglide-pro-midline-catheter

47. Thus, C.R. Bard's key modification of the Bard Powerglide, which resulted in the new version of its product, the Powerglide Pro was moving the grip forward from the operator's end of the catheter toward the patient. This modification is a key feature disclosed within the invention claimed by the Asserted Patent and claimed at least in claim 1 of the Asserted Patent.

48. The Accused Product is sold as part of a kit, which includes not just the Accused Product, including for example, a stabilization device, skin prep pads, ID stickers, adhesive foam strips, alcohol wipes, an absorbent drape, a fenestrated drape, an absorbent towel, tourniquet, mask, gloves, chloraprep applicator, bordered dressing, surgical drape, measuring tape, 2" x 2" gauze, 4" x 4" gauze, sterile saline, extension set, bedside sign, and patient guide, which are sold together as a functional unit, and, thus are convoyed sales. The Accused Product would not be usable without the stabilization device, skin prep pads, ID stickers, adhesive foam strips, alcohol wipes, an absorbent drape, a fenestrated drape, an absorbent towel, tourniquet, mask, gloves, chloraprep applicator, bordered dressing, surgical drape, measuring tape, 2" x 2" gauze, 4" x 4" gauze, sterile saline, extension set, bedside sign, and patient guide that are sold as part of the kit, All are required for the insertion procedure and fixation and as recommended by the Defendant. Thus, all sales of the Accused Product and associated kits are part of the royalty base for any damages calculation.

## V.    DEFENDANT LEARNS OF BULLPUP'S PATENT AND CONTINUES SELLING THE ACCUSED PRODUCT DESPITE BEING COVERED BY THE ASSERTED PATENT

49. Since the issuance of the Asserted Patent and Defendant's launch of the Accused Product into the market, Defendant and Bullpup continued to communicate regarding midline catheter insertion mechanisms.

50.    As background, in 2018, Bullpup released its M/29 Bullpup Midline IV Catheter System in Europe, which practices one or more claims of the Asserted Patent.  To date, Bullpup has not yet sold the M/29 Bullpup Midline IV Catheter System in the United States.

51.    After the release of Bullpup's product and the issuance of the Asserted Patent, in mid-to-late 2019, Defendant and Bullpup discussed Bullpup's commercial product, the M/29 Bullpup Midline Catheter.

52.    More specifically, on October 29, 2019, Bullpup and Defendant entered into a confidential disclosure agreement to allow Defendant to evaluate a potential business opportunity in connection with Bullpup's innovative midline catheter insertion device claimed in the Asserted Patent. As part of this confidential disclosure agreement, Defendant requested Bullpup provide 70-80 samples of the M/29 Bullpup Midline Catheter for testing and to request customer feedback regarding the device.

53.    At that time, Defendant indicated that it was familiar the Bullpup product and requested the samples in order to conduct bench testing and get direct feedback from users of the product in the existing European markets in order to assess a potential business opportunity with Bullpup.  After these initial communications, Defendant requested a meeting with Bullpup at the 2019 MEDICA trade fair for medical technology and healthcare in order to introduce Bullpup to Defendant's European marketing manager for vascular access devices. By this time, the Asserted Patent had issued.

54.    In November 2019, Bullpup met with Defendant at the MEDICA trade fair for medical technology and healthcare, and provided samples of the M/29 Bullpup Midline IV Catheter System to Defendant.  Along with these samples, Bullpup provided Defendant with an updated product brochure, which specifically identified that the M/29 Bullpup Midline IV Catheter

System was covered by Bullpup's newly issued Asserted Patent. Upon receipt of those devices, Defendant requested even more samples. After multiple communications regarding the samples and the functioning of Bullpup's device, Bullpup sent the additional samples to Defendant, which arrived sometime around February 10, 2020.

55.    On May 5, 2020, Defendant confirmed they had started reviewing the samples but had not completed their testing. At that time, Defendant indicated that after COVID travel and other restrictions would be lifted, Defendant wanted to re-engage with Bullpup and complete their assessment of the M/29 Bullpup Midline IV Catheter System.  In the 2019 and 2020 discussions between Bullpup and Defendant, Defendant asked Bullpup if Defendant could license or acquire the intellectual property, and specifically Bullpup's Asserted Patent, covering the Bullpup product. During those preliminary discussions, Bullpup's personnel indicated they were open to such an arrangement, but discussions never progressed beyond the initial interest stage.   However, Defendant specifically inquired about potentially licensing the Asserted Patent during these discussions.

56.    Based on Defendant and its predecessor's continuous inquiry and copying of Bullpup's innovative designs and products, Defendant has been able to not only improve its product offerings, but also maintain a significant market advantage in the midline catheter market. Defendant has been aware of the Asserted Patent since its issuance, as well as the international patent application from which the Asserted Patent claims priority since 2015.  As described above, Defendant had earlier expressed significant interest in the international patent application from which the Asserted Patent's application claims priority.

57.    Bullpup has not sold the M/29 Bullpup Midline IV Catheter System in the United States, and thus, is not subject to the marking requirements under 35 U.S.C. §287.  Bullpup has

had great difficulty entering the U.S. market for midline catheter insertion systems because Defendant's dominant share of the midline catheter insertion market. For example, Defendant has an extremely strong presence in the U.S. due to its sales force and discounts offered through bundling sales. For a given hospital, Defendant typically offers to supply all of the hospital's supply and training needs, of which catheters are a portion. The hospitals receive discounts through such bundling that make differences in costs between catheters an insignificant factor when deciding between suppliers. Companies that only sell catheter insertion systems typically cannot compete with Defendant's sales force combined with its bundled discount sales.

### VI.    COUNT 1: PATENT INFRINGEMENT OF U.S. 10,413,706

58.    Plaintiff restates and realleges the preceding paragraphs of this Complaint, as though fully set forth herein, specifically Paragraphs 1 through 57.

59.    Bullpup is the owner of all right and title in the Asserted Patent, including all rights to enforce and prosecute actions for infringement of the Asserted Patent and to collect damages for all relevant times against infringers of the Asserted Patent. Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the Asserted Patent by Defendant.

60.    Defendant has directly and/or indirectly infringed, and/or continues to directly and/or indirectly infringe, literally and/or under the doctrine of equivalents, at least claims 1 and 13 of the Asserted Patent, by making, using, testing, selling, offering for sale and/or importing into the United States the Accused Product.

A.    <u>Direct Infringement By Defendant Under 35 U.S.C. § 271(a)</u>

61.    Defendant directly infringes at least claim 1 of the Asserted Patent pursuant to 35 U.S.C. § 271(a) either literally or under the doctrine of equivalents to the extent it uses, sells, offers for sale in the U.S., or imports into the U.S. the Accused Product.

62.    The Accused Product is a catheter insertion system and Defendant advertises that the Accused Product is "[a] fully integrated placement device designed to be a simplified solution for peripheral IV therapy."[11] Further, Defendant describes that the Accused Product is used for a catheter "insertion procedure," can help "[medical professionals] place catheters confidently and efficiently" as well help simplify the insertion process:[12]



_____

[11]https://www.bd.com/en-us/products-and-solutions/products/product-families/powerglide-midline-catheters#powerglidepro
[12]https://www.bd.com/en-us/products-and-solutions/products/product-families/powerglide-midline-catheters#powerglidepro

63.     The Accused Product includes an IV catheter[13] that utilizes a distal cannula attached to a proximal hollow hub.  For example, in the figures of the Accused Product reproduced below, the cannula is the part of the catheter that is to the left of the green and purple part of the catheter, and the proximal hollow hub includes the purple part of the catheter that is attached to the cannula:[14]



64.     The needle ((1) in the below picture) of the Accused Product is configured to pass through and protrude from the hollow cannula:[15]

---

[13]https://www.bd.com/en-us/products-and-solutions/products/product-families/powerglide-midline-catheters#powerglidepro
[14] https://www.bd.com/en-ca/products-and-solutions/products/product-families/powerglide-pro-midline-catheter
[15]https://www.bd.com/en-us/products-and-solutions/products/product-families/powerglide-midline-catheters#powerglidepro



**BD Instaflash™ Needle Technology**

Can confirm immediate vessel entry at the point of insertion to improve first-stick success, potentially reducing painful hit-and-miss insertions

65.    The Accused Product's catheter includes a forward arm, which includes a distal forward grip, downward grip, and a middle section connecting between the distal forward grip and the downward grip connected to a proximal end of the middle section.

66.    For example, the Accused Product's forward arm includes catheter wings, which are a distal forward grip: [16]

---

[16]    https://www.bd.com/en-ca/products-and-solutions/products/product-families/powerglide-pro-midline-catheter



67.    The Accused Product's forward arm is attachable connected to the catheter hub, which is a proximal portion of the catheter or element connected thereto, via a downward grip, which includes two grasping arms which extend downwards and are substantially curved:[17]



68.    As shown in the annotated image below, the Accused Product's forward arm extends distally (away from the operator) from the downward grip's connection to the catheter hub[18]:

---

[17] https://www.bd.com/en-ca/products-and-solutions/products/product-families/powerglide-pro-midline-catheter
[18] https://www.bd.com/en-ca/products-and-solutions/products/product-families/powerglide-pro-midline-catheter



69. The Accused Product's forward arm includes a middle section connecting between the catheter wings (distal forward grip) and the downward grip which is located at the proximal end (end closest to operator) of the middle section.



70. Defendant also directly infringes at least claim 13 of the Asserted Patent through Defendant's use of the Accused Product during, for example, development, testing, or manufacturing of the Accused Product.

71.    In addition to the elements of claim 1 that the Accused Product includes, discussed above, as explained in Paragraphs 58 through 69, the Accused Product also includes a housing (referenced by number 6 in the below image), which is a catheter closing unit that includes a proximal stabilizing grip (referenced by number 8 in the below image):[19]



72.    The stabilizing grip, held with the right hand is proximal (closer to the operator) than the catheter wings (distal forward grip), held with the left hand: [20]

---

[19]https://www.bd.com/en-us/products-and-solutions/products/product-families/powerglide-midline-catheters#powerglidepro
[20]https://static.bd.com/assets/product/Documents/Peripheral%20Intervention%20(PI)/PF10364-0747882_powerglide_pro_ifu_web.pdf





73.    The Accused Product's proximal stabilizing grip includes a hollow surface corresponding in shape and adapted to be close fitting around said proximal end portion.

74.    For example, as shown in the images reproduced below, the Asserted Product's housing, which includes the proximal stabilizing grip, appears to include a hollow surface corresponding in shape and adapted to be close fitting around the proximal end portion of the catheter because the catheter is configured to slide along the inside of the housing to remove the catheter from the housing:[21]

---

[21]https://static.bd.com/assets/product/Documents/Peripheral%20Intervention%20(PI)/PF10364-0747882_powerglide_pro_ifu_web.pdf



75.    The Accused Product's catheter closing unit further comprises two side arms attached to said proximal stabilizing grip.

76.    For example, as shown below the Accused Product's housing includes two side arms (annotated with red arrows), which open outwardly when the catheter is slid out of the catheter closing unit:[22]

---

[22] https://www.youtube.com/watch?v=Jhv7QdS7AUc (at 0:40 of 1:32)



PowerGlide Pro™ Midline Catheter Insertion Video



PowerGlide Pro™ Midline Catheter Insertion Video



77.     As described above, Defendant's Accused Products meet all claim limitations of at least claims 1 and 13 of the Asserted Patent and directly infringe at least those claims pursuant to 35 U.S.C. § 271(a).

B.     Indirect Infringement Under 35 U.S.C. §§ 271(b), (c)

78.     Additionally, Defendant is liable under 35 U.S.C. §§ 271(b) and (c) for indirect infringement of the Asserted Patent, either literally or under the doctrine of equivalents, because it actively induces and/or contributes to the direct infringement of the Asserted Patent by its customers who make, use, and/or import the Accused Products methods and devices identified in the claims of the Asserted Patent.

79.     For example, Defendant at least indirectly infringes claim 1 of the Asserted Patent under 35 U.S.C. § 271(b).  As explained in Paragraphs 58 through 69, the Accused Products directly infringe at least claims 1 and 13.

80.     For its customers, Defendant provides specific step-by-step instructions on how to use and deploy the Accused Product. More specifically, Defendant provides written, step-by-step

instructions[23] for precisely how to insert the catheter and the proper method for doing so, all of which directly infringe at least claims 1 and 13 of the Asserted Patent:

---

## INSERTION INSTRUCTIONS

PowerGlide Pro™ Midline Catheter Diagram



1.  Identify the vein and insertion site.
    **Warning:** (Pediatric) Insertion techniques and placement locations are often modified according to the size and developmental age of the child. Only clinicians experienced in proper positioning and placement of venous catheters in pediatric patients should place this catheter in this patient population.
2.  Clean and prepare insertion site per your institution's policy.
3.  Remove needle sheath from plastic housing.
    Suggestion: To break catheter tip adhesion before inserting the needle, do the following steps:
    A) Fully advance guidewire
    B) Advance and retract catheter wings 1/8 in.
    C) Retract guidewire
4.  Insert the needle into the vein and observe for blood return in the catheter.
5.  Advance the guidewire using the guidewire push-off button until fully deployed.
    **CAUTION:** Wings will not deploy until guidewire is fully advanced..
    **CAUTION:** Blood return will slow or stop once the guidewire is fully extended..
6.  Fully advance the catheter using the catheter wings.
    Caution: ALWAYS keep the housing stationary while advancing catheter wings. Failure to do so may prevent catheter from entering vein and cause delays in procedure.
    **Warning:** If the artery is unintentionally entered, withdraw the needle and apply manual pressure for several minutes. Failure to do so may lead to patient blood loss.
    **Warning:** Once the catheter has been advanced, do not re-insert the needle back into the catheter or pull the catheter back onto the needle. If the catheter needs to be repositioned, either do so without the aid of the needle, or remove both the catheter and the needle as a unit to prevent the needle from damaging or shearing the catheter.
7.  While holding the catheter wings in place, fully remove housing from the catheter.
    **Note:** Catheter wings remain temporarily connected to catheter hub after housing removal.
    **Note:** Discard housing and needle per institutional policy.
8.  While holding the proximal end of the wing assembly to stabilize the device, lift up and fold back wings.
9.  Remove wings from the catheter.
10. Immediately attach primed extension set and/or injection cap to the catheter per your institution's policy.

81.     By providing these specific instructions to its customers to use and deploy the Accused Product in a manner that infringes both claims 1 and 13 of the Asserted Patent, Defendant specifically intends its customers to infringe those claims of the Asserted Patent.

82.     As instructed by Defendant, use of the Accused Product includes providing a catheter insertion system comprising an IV catheter comprising a distal cannula attached to a proximal hollow hub, and comprising a proximal hollow end portion; a forward arm attachably connected to a proximal portion of said IV catheter or element connected thereto, and extending distally therefrom; a needle passing through said IV catheter; and a catheter closing unit comprising a proximal stabilizing grip which comprises a hollow surface corresponding in shape and adapted to be close fitting around said proximal end portion; wherein said catheter closing unit further comprises two side arms attached to said proximal stabilizing grip.

83.     As instructed by Defendant, use of the Accused Product also includes puncturing the patient's blood vessel.  For example, as shown in the image reproduced below, Defendant's instructions for use of the Accused Product include a step of "INSERT NEEDLE IN VEIN": [24]

---

[24]https://static.bd.com/assets/product/Documents/Peripheral%20Intervention%20(PI)/PF10364-0747882_powerglide_pro_ifu_web.pdf



84.     As instructed by Defendant, use of the Accused Product also includes pulling/pushing said forward arm distally thus inserting the cannula into the blood vessel, and inserting the cannula in place by continuing to pull/push the forward arm distally.

85.     For example, as shown in the image reproduced below, Defendant's instructions for use of the Accused Product include a step of "ADVANCE CATHETER WINGS," and shows pulling/pushing the forward arm distally (away from the operator) by pulling/pushing the catheter wings with the left hand to insert the cannula into the blood vessel: [25]

---

[25] https://static.bd.com/assets/product/Documents/Peripheral%20Intervention%20(PI)/PF10364-0747882_powerglide_pro_ifu_web.pdf



86.    As instructed by Defendant, use of the Accused Product also includes proximally pulling a puncturing needle until it exits the IV catheter and removing it from the IV catheter thereafter.  For example, as shown in the image reproduced below, Defendant's instructions for use of the Accused Product include a step of "FULLY REMOVE HOUSING" where the needle is

pulled proximally (toward the operator) until the needle exits the catheter and the housing (catheter

closing unit) is no longer attached to the catheter: [26]



87.    As instructed by Defendant, use of the Accused Product also includes disconnecting

the forward arm from said IV catheter or element connected thereto.  For example, as shown in the

image reproduced below, Defendant's instructions for use of the Accused Product include the steps

---

[26]https://static.bd.com/assets/product/Documents/Peripheral%20Intervention%20(PI)/PF10364-0747882_powerglide_pro_ifu_web.pdf

of "LIFT UP CATHETER WINGS" and "REMOVE WINGS"), where the catheter wings together

with its forward arm is disconnected from the catheter:[27]





---

[27] https://static.bd.com/assets/product/Documents/Peripheral%20Intervention%20(PI)/PF10364-0747882_powerglide_pro_ifu_web.pdf

88. As instructed by Defendant, use of the Accused Product also includes fixing the IV catheter to the patient's skin. For example, as shown in the image reproduced below, Defendant's instructions for use of the Accused Product include a step of "DRESS SITE PER INSTITUTIONAL POLICY" where the images show the catheter is fixed to the patient's skin:[28]



89. Defendant also had specific intent and knowledge that by providing the Accused Product and use instructions for the same to its customers that it was infringing the asserted claims

---

[28]https://static.bd.com/assets/product/Documents/Peripheral%20Intervention%20(PI)/PF10364-0747882_powerglide_pro_ifu_web.pdf

of the Asserted Patent. More specifically, Defendant was aware of the Asserted Patent as of, at the latest, November 2019 after the parties had entered into a "Confidential Disclosure Agreement" in November of 2019 and Bullpup sent Defendant a brochure that specifically identified that BullPup's M/29 Catheter was covered by the Asserted Patent and also provided more than 70 samples of its M/29 Bullpup Midline IV Catheter System. Additionally, during the November 2019 meeting at the MEDICA trade fair, Defendant asked Bullpup if Defendant could license or acquire the intellectual property, and specifically Bullpup's Asserted Patent, covering the Bullpup product. Therefore, Defendant was expressly aware of the Asserted Patent and its claims no later than November 2019.

90.     Additionally, upon information and belief, Defendant has exhibited willful blindness when it comes to its knowledge of Bullpup's Asserted Patent and its covered products. As discussed above, after the issuance of the Asserted Patent, Defendant and Bullpup had months of detailed and specific discussions regarding Bullpup's patented products and intellectual property. In October of 2019, after the Asserted Patent issued, Bullpup provide 70-80 samples of the M/29 Bullpup Midline Catheter at Defendant's request so Defendant could study the device in detail, along with a brochure that specifically identified that the product was covered by the Asserted Patent. After doing so, Defendant requested an in person meeting at an upcoming medical technology fair and for additional product samples. The parties' discussions continued during and after that medical fair. More specifically, during these discussions Defendant not only acknowledged that Bullpup had a patent that covered the Bullpup device, but asked about potentially licensing that patent itself.  Despite asking questions about licensing the Asserted Patent, Defendant chose not to and continued to sell the Accused Product despite knowing the Accused Product was covered by the claims of the Asserted Patent. Instead of properly vetting the

claims of the Asserted Patent at this stage, Defendant knew that there was a high probability – after its months-long inspection of Bullpup's covered product and Bullpup's intellectual property – that its Accused Product infringed the claims of Bullpup's Asserted Patent and intentionally stopped seeking additional information or requesting further details regarding a potential license of the Asserted Patent in order to avoid learning additional information. As such, no later than mid-2020, Defendant intentionally made the choice to be willfully blind regarding the existence and application of Bullpup's Asserted Patent and the infringement of the Accused Products by the same.

91.     Further, Defendant contributes to the infringement of at least claims 1 and 13 of the Asserted Patent by its customers and end users of at least the Accused Product and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). The Accused Products are especially designed to be catheter insertion systems, and especially designed to insert catheters in the manners described above which infringe at least claims 1 and 13 of the Asserted Patent. Given the specific application as identified by Defendant's instructions for use for the Accused Product, the Accused Products have no substantial non-infringing use, as they are specifically designed and marketed for inserting catheters. Setup and use of the Accused Product by Defendant's customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claims 1 and 13 of the Asserted Patent and given the specific and limited use of the Accused Product the components sold or offered for sale have no substantial non-infringing uses.

C.     Willful Infringement

92.     With regard to each theory of infringement presented herein, Defendant's infringement of the Asserted Patent has been willful, both before the filing of this complaint and continues to be so after filing. As described above, Defendant has been on notice of the Asserted

Patent since at least November 2019. More specifically, prior to the filing of this complaint, Defendant has been aware of the Asserted Patent and its infringement through Bullpup's discussions with Defendant's representatives in late 2019 and early 2020 when the parties were discussing Bullpup's products and the Asserted Patent.

93.    Further, upon information and belief, Defendant was monitoring Bullpup and the Asserted Patent, its prior applications, and its foreign counterparts based on the parties' express conduct and communications. As identified above, Bullpup's communications regarding the inventive device and methodology started as far back as 2015 with C.R. Bard, which was later acquired by the Defendant. Over the course of the next five-to-six years, Defendant (and its predecessor) continuously monitored Bullpup's product and intellectual property advances. Defendant's specific conduct ranged from inquiries via email, requests for non-disclosure agreements, seeking more than 100 product samples of Bullpup's covered devices, and express discussions regarding potentially licensing the Asserted Patent. This pattern of conduct demonstrates a thorough and intentional monitoring of Bullpup's products and intellectual property, including the Asserted Patent.

94.    Since the filing of this action, Defendant's infringement of the Asserted Patent has been willful, deliberate and intentional by committing these acts of infringement with knowledge of the Asserted Patent, and after acquiring knowledge of the Asserted Patent, Defendant has continued to commit these acts of infringement knowing, or at worst should have known, that its conduct amounted to infringement of the Asserted Patent, and thus Defendant has acted in reckless disregard of Bullpup's patent rights. Since the filing of this action, Defendant has been aware of the unjustifiably high risk that its actions constituted and continue to constitute infringement of the Asserted Patent, and that the Asserted Patent is valid.

95.     Because of Defendant's pre-filing and post-filing ongoing willful infringement, Bullpup is entitled to enhanced damages under 35 U.S.C. § 284.

D.     <u>Damages For Infringement</u>

96.     Bullpup has been damaged as a result of Defendant's infringing conduct. Defendant is, thus, liable to Bullpup in an amount that adequately compensates Bullpup for Defendant's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Such damages include all convoyed sales for non-infringing products sold in conjunction with the Accused Product. Additionally, Bullpup will continue to suffer irreparable loss and injury unless the Defendant is permanently enjoined from infringing the Asserted Patent.

## VII.    **<u>JURY DEMAND</u>**

97.     Bullpup hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## VIII.    **<u>PRAYER FOR RELIEF</u>**

98.     WHEREFORE, Bullpup respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Bullpup the following relief:

a.     Judgment that one or more claims of the Asserted Patents have been infringed, either literally or under the doctrine of equivalents, by Defendant; and/or judgment that one or more claims of the Asserted Patent have been directly infringed by others and indirectly infringed by Defendant, to the extent Defendant contributed to or actively induced such direct infringement by others;

b.     Judgment that Defendant account for and pay to Plaintiff damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for

the use made of the invention by the infringer, together with interest and costs as fixed by the court, as permitted by 35 U.S.C. § 284;

c.     Judgment that the non-infringing products sold alongside the Accused Products as part of a kit are convoyed sales that should be included in the damages Plaintiff must pay to compensate for infringement.

d.     A permanent injunction, enjoining Defendant along with its officers, directors, agents, servants, employees, affiliates, divisions, branches, subsidiaries, and parents from infringing one or more claims of the Asserted Patent, or in the alternative, if the Court finds that an injunction is not warranted, Plaintiff requests an award of post judgment royalty to compensate for future infringement;

e.     Judgment that Defendant's infringement be found to be willful, and that the Court award treble damages for such willful infringement pursuant to 35 U.S.C. § 284;

f.     That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities;

g.     That the Court declare this an exception case and award Plaintiff its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

h.     That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

Date:   January 27, 2026

Respectfully submitted,

*/s/ Peter Kirschenbaum*

Peter Kirschenbaum
Guy Yonay (pro hac vice forthcoming)
Kyle Auteri (pro hac vice forthcoming)
PEARL COHEN ZEDEK LATZER BARATZ LLP
7 Times Square, 19th Floor
New York, NY 10036
Tel: 646-878-0800
Fax: 646-878-0801
pkirschenbaum@pearlcohen.com
gyonay@pearlcohen.com
kauteri@pearlcohen.com

Jonathan T. Suder (pro hac vice forthcoming)
Glenn S. Orman (pro hac vice forthcoming)
Dave R. Gunter (pro hac vice forthcoming)
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, TX 76102
Tel: 817-334-0401
Fax: 817-334-0401
jts@fsclaw.com
orman@fsclaw.com
gunter@fsclaw.com

**ATTORNEYS FOR PLAINTIFF
BULLPUP SCIENTIFIC LTD.**